IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

**GEORGE J. PURIFOY**                                                **PLAINTIFF**

**V.**                              **CASE NO. 3:17-CV-03079**

**JERRY WILLIAMS, Jail Administrator,**
**Carroll County Detention Center,**
**CCDC; ANDREA MORRELL, Shift**
**Supervisor, CCDC; MELISSA EASTER,**
**Sergeant/Accounts Officer, CCDC; A.**
**LEMUS, Sergeant/Shift Supervisor,**
**CCDC**                                                          **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Plaintiff George J. Purifoy filed this action pursuant to 42 U.S.C. § 1983.  He

proceeds *pro se* and *in forma pauperis*.  This case arises out of Plaintiff's incarceration

in the Carroll County Detention Center ("CCDC").  Plaintiff maintains his constitutional

rights were violated in the following ways:  (1) he was denied adequate medical care,

primarily for hypoglycemia;[1] (2) he was served an inadequate diet; (3) he was charged

exorbitant prices for basic hygiene items and over-the-counter medications; (4) his

access to televised news was limited to one or two channels consisting of "a nonstop

barrage of political brainwashing"; (5) his possession of reading material was unfairly

restricted, and he was not allowed to have material mailed to him; and (6) he was denied

pastoral visits and church services.  Plaintiff has named as Defendants to this action the

---

[1] Hypoglycemia is defined as: "Symptoms resulting from low blood glucose (normal
glucose range 60–100 mg/dL [3.3–5.6 mmol/L]), which are either autonomic or
neuroglycopenic. Autonomic symptoms include sweating, trembling, feelings of warmth,
anxiety, and nausea. Neuroglycopenic symptoms include feelings of dizziness, confusion,
tiredness, difficulty speaking, headache, and inability to concentrate."
https://www.medilexicon.com/dictionary/42885 (accessed August 31, 2018).

1

Jail Administrator, Lieutenant Jerry Williams; two shift supervisors, Sergeant Andrea Morrell and Sergeant A. Lemus; and the accounts officer, Sergeant Melissa Easter. The case is now before the Court on the Defendants' Motion Summary Judgment (Doc. 22). Plaintiff has responded to the Motion, see Doc. 26, and the matter is now ripe for decision.

## I.     BACKGROUND

Plaintiff was booked into the CCDC on March 23, 2017. (Doc. 24-2 at 1). He had no medication with him. His weight was noted as 170 pounds, and his height was 5'11". Id.

### A.  Medical Care

During his deposition, Plaintiff testified that he had been hypoglycemic his entire life. (Doc. 24-10 at 18). He claimed that if he did not get enough to eat, he would start feeling lightheaded and shaky and sometimes pass out, but if he got something to eat, he would be fine. He also confirmed that in the free world, he would carry a snack with him in case he started feeling lightheaded. Id.

With respect to medical treatment for hypoglycemia, Plaintiff testified that he had not seen a doctor on a regular basis in 20 to 30 years. Id. at 19. Instead, he only saw a doctor when something was wrong. Id. He preferred managing his hypoglycemia on his own, through diet, and he testified that he had never taken any medication for this condition. Id. at 19, 20. He also did not measure his blood sugar on a regular basis. Id. at 21. According to Plaintiff, his normal weight is about 180 pounds, but he does not believe his weight affects his hypoglycemia.  He testified that his episodes of

2

hypoglycemia would sometimes occur every few weeks or every few months, but other times would occur more frequently, such as every day for a month. *Id.* at 22.

Shortly after he was incarcerated at the CCDC, Plaintiff began experiencing nose bleeds, bleeding gums, bloody stool, and problems with urination. *Id.* at 26. According to Plaintiff, he informed the jail staff about these symptoms, but he was ignored. About a week or so after he entered CCDC custody, on March 31, 2017, Plaintiff submitted a medical request in which he stated he had informed booking staff of his hypoglycemia and had received no medical attention. (Doc. 24-5 at 1). He stated that he was beginning to have tremors in his hands, his vision was sometimes cloudy in the evening, and he occasionally had vertigo. *Id.* Plaintiff also complained in the grievance that the meager rations he was served at the jail were insufficient to maintain his blood sugar level. *Id.* He claimed that since he had no money in his jail account, he could not purchase commissary items to supplement his diet. *Id.* Nurse W responded in writing to his grievance, noting, "I have added this for you." *Id.*

According to Plaintiff, on April 2, 2017, he began receiving a snack at night. (Doc. 24-10 at 60). Plaintiff testified that for most of the month of April, he was in solitary confinement and did not have access to a kiosk. *Id.* at 45. He indicated that he was rarely let out of the cell during that time. *Id.* On April 25, 2017, Plaintiff asked staff if he needed to see the doctor to have his hypoglycemia addressed. (Doc. 24-5 at 2). He said he had mentioned this condition during intake and had made a request to see a doctor at that time, but he had not received any attention. Nurse W responded in writing that Plaintiff was already receiving a peanut butter sandwich at night. Nurse W also indicated

that the extra sandwich was on his med list, and that the jail did not provide snacks during the day.

On May 17, 2017, Plaintiff submitted a request stating he noticed jaundiced bruising appearing on his left leg and was beginning to experience some pain. *Id.* at 4. Nurse W responded that jaundiced bruising simply indicates a healing bruise. She advised Plaintiff to have "Bing" look at it the next day at med pass. *Id.*

According to Plaintiff, Officer Collins handled the issue of his bruising by taking pictures and sending them to Dr. Bell. (Doc. 24-10 at 44). On May 18, 2017, Dr. Bell put Plaintiff on a low dose of aspirin and Ibuprofen. (Doc. 24-4 at 1). Plaintiff was told he was put on the list to see the doctor.

On June 22, 2017, Plaintiff asked that his prescriptions for 81 mg aspirin and 600 mg Ibuprofen be renewed. (Doc. 24-5 at 5). Nurse R responded that the medications had been ordered. Plaintiff testified he did not ask to see a doctor with respect to this request because he had already been told by Officer Collins that he was on the list to see the doctor. (Doc. 24-10 at 48).

On July 15, 2017, Plaintiff submitted a request stating he had been told by Officer Collins that the doctor wanted to see him. (Doc. 24-5 at 6). He also complained of having "occasional chest pain and possible circulatory problems." *Id.* He was told that he would see the doctor the following month.

On August 4, 2017, Plaintiff submitted a request stating he had been passed over several times for doctor's visits and wanted to make sure he was not forgotten the next time the doctor came. *Id.* at 7. He stated he was experiencing several problems including

recent bleeding in his soft tissues and stool. *Id.* Nurse R responded that he was on the list to see the doctor on August 18th.

On August 14, 2017, Plaintiff submitted a request stating he was having increasing difficulty with his symptoms of hypoglycemia. *Id.* at 8. He complained that the extra peanut butter sandwiches he had been receiving in the evenings hardly contained any peanut butter. He also asserted that the "meager diet provided here simply isn't enough calories to get me through between mealtimes." *Id.* Nurse R responded that he would be seeing the doctor on Friday and should talk to him about it.

Plaintiff testified that he was seen by Dr. Bell on Friday, August 18, 2017. (Doc. 24-10 at 55, 60). Plaintiff talked to Dr. Bell about his hypoglycemia. Dr. Bell ordered Plaintiff's blood sugar to be tested twice a day for one week, put him on double portions and a high protein diet, and continued his nighttime snack. *Id.*; Doc. 24-4 at 2. Plaintiff's weight was recorded as 160 pounds on that date. (Doc. 24-4 at 2). Plaintiff indicated during the medical visit that he did not believe it was necessary to test his blood sugar so long as he had enough to eat. (Doc. 24-10 at 61). Dr. Bell, however, stated that he wanted to see what Plaintiff's blood sugar was, so he ordered that it be tested.

Plaintiff testified that with respect to his diet, the kitchen staff claimed he was just put on a high protein diet, which meant he received an "extra piece of tofu with [his] meal." (Doc. 24-10 at 55). Plaintiff testified he was not sure who had prevented him from receiving double portions, but he knew that Sergeant Easter was "over the kitchen." *Id.* He testified that he did not believe Sergeant Easter had any reason to deprive him of a medically ordered diet. *Id.* at 56.

5

On August 21, 2017, Plaintiff submitted a request stating that the doctor had put him on a special diet because he was 25 pounds underweight, but the evening snack he was receiving consisted only of "two pieces of bread with barely any peanut but[t]er scraped across one piece." (Doc. 24-5 at 9). He stated this was a direct threat to his personal health. Sergeant Lemus noted that he had seen an inmate putting two tablespoons of peanut butter on the sandwiches the previous morning. Nurse R also responded that two tablespoons was more than enough peanut butter for a snack.

On August 23, 2017, Plaintiff submitted another request about the peanut butter sandwiches. (Doc. 24-5 at 10). He said "[t]here is nowhere near two tablespoons of peanut butter on these sandwiches and anyone that says so hasn't looked at them and is lying or is completely blind." *Id.* He stated he showed two officers the sandwiches on different dates to prove how little peanut butter had been placed on them. In response, Nurse R confirmed that she had been told that two tablespoons of peanut butter was placed on each sandwich. Plaintiff submitted a second request that same day for medical attention, in which he claimed he was not receiving his ointment or vitamins. (Doc. 24-5 at 11). In response, Nurse R stated that both items were on the medical cart.

On August 28, 2017, Plaintiff submitted another grievance about his blood sugar not being tested twice a day as ordered by the doctor. (Doc. 24-3 at 21). He claimed his blood sugar had only been tested successfully on one occasion since the doctor gave the order. Nurse R responded that she would look into it. On September 5, 2017, Plaintiff submitted another grievance, claiming nothing had been done yet about this issue. The following day, Nurse R replied that the order was back on the list for his blood sugar to be tested two times a day for a week.

On August 29, 2017, Plaintiff asked for his multi-vitamin to be administered at night. (Doc. 24-5 at 12). Nurse R responded that she had changed it. On September 12, 2017, Plaintiff submitted a request stating that his blood sugar was still not being monitored per the doctor's instructions. (Doc. 24-5 at 13). He claimed that it had been only taken once since his last complaint. Nurse R responded that she would look into it. Then, on September 15, Nurse R sent Plaintiff a note stating that she had not realized they were low on supplies to get his blood sugar tested. She informed him that supplies had been ordered and once they were received, she would order his blood sugar to be taken.

On October 9, 2017, Plaintiff submitted another grievance about his medical care, explaining that he had been asking to see the doctor for two weeks, and he was told the list for the month was full, so he would have to wait until the next month. (Doc. 24-3 at 29). Lieutenant Williams responded in writing, indicating that he had talked to medical staff, and Plaintiff would be seen by the doctor that same month, on October 20, 2017. Plaintiff was also told that if he felt he had additional medical concerns that rose to the level of an emergency, he should not hesitate to inform the staff.

Plaintiff's medication sheet indicates that his blood sugar was to be checked daily from October 18, 2017, until October 21, 2017. (Doc. 24-4 at 4). The sheet that covers dates from April 2, 2017, to October 18, 2017, contains no other order for blood sugar checks. The only change in his diet that appears on the medication sheet is the addition of the peanut butter sandwich at bedtime on April 2, 2017.

Plaintiff was next seen by the doctor on October 20, 2017. (Doc. 24-4 at 3). Plaintiff was complaining of stress, anxiety, and poor sleep. His weight was noted to be 165 pounds. Dr. Bell ordered Plaintiff to have double portions of food at supper time and for

7

his blood sugar to be checked as needed. On October 24, 2017, Plaintiff submitted a request stating that the doctor had authorized double portions of food, and the tofu he had been receiving was making him constipated. A handwritten note in Plaintiff's medical file stated that the double portion order "was added to [his]list 10/25/17." *Id.*

Plaintiff testified that he did not know if any of the Defendants were aware of all the delays he had been experiencing in trying to see the doctor. (Doc. 24-10 at 49). However, he assumed that the Defendants knew because "they're the ones that are in charge," and "they're the ones that are running the show here." *Id.* Plaintiff testified he never directly talked to Lieutenant Williams about his medical care. *Id.* at 49-50. However, Lieutenant Williams was involved in the grievance process and "there's been some that he's chimed in on." *Id.* at 50.

With respect to Sergeant Morrell, Plaintiff testified that he did not believe she was involved in any way with his medical grievances. *Id.* at 51. Plaintiff also testified that he did not know if either Sergeant Easter or Sergeant Lemus was aware of his having been told by Officer Collins that the doctor wanted to see him. *Id.* at 51-54.

Plaintiff also did not know if the Defendants were personally involved in his medical care. *Id.* at 53-54. None of the Defendants was present when Plaintiff was seen by the doctor. *Id.* at 54. Plaintiff also testified that he never had a discussion with any of the Defendants about his medical care, and none of them ever tested his blood sugar levels. *Id.* at 65.

With respect to the existence of any Carroll County policy or custom, Plaintiff testified that "someone was not following the doctor's order." He conceded, however, that this was not a policy of the County. Nevertheless, Plaintiff maintains the facts

8

"clearly demonstrate negligence on the part of the Defendants in that they failed in their administrative capacity to assure the execution of valid orders from a licensed medical professional." (Doc. 26 at 2).

## B. Diet

Plaintiff submitted grievances about his diet on the following days:

- 6/8/2017—food being served by other inmates; one of them rubbed his eyes and was picking his nose and then handed out my food and drink;

- 6/10/2017—inmates still handing out my food; did not receive milk this morning;

- 6/16/2017—situation regarding inmates handing out my food has not been rectified;

- 6/17/2017—breakfast tray served by another inmate and Corporal Madel was in the pod;

- 6/19/2017—over weekend and this morning inmates allowed to pass trays;

- 6/22/2017—situation regarding inmates handing out trays not getting rectified; inmates "cherry picking for larger portions;" inmates "scratching" themselves; he asked that the inmates at least be given gloves;

- 6/26/2017—inmates delivering trays;

- 6/28/2017—inmates serving trays;

- 7/5/2107—inmates serving trays;

- 7/24/2017—food portions have become miniscule and unevenly divided; cornbread and brownie have been tiny slivers where as other inmates' helpings were twice as big; inmate server laughed when something was mentioned about poor portioning of food;

- 7/26/2017—issue has not been resolved; brownie half an inch by maybe an inch and a half and hard as a rock; putting trash on someone's plate is a personal affront; we are people not dogs; people doing life

sentences for murder are better fed than us and I have not been convicted; diet is substantially below federal guidelines;

8/14/2017—sandwiches has barely any peanut butter on them; I have aggressive hypoglycemia and barely get enough as it is on the meager diet; I depend on those calories to get me through the night until breakfast; situation is a direct threat do my health;

8/19/2017—doctor ordered an extended diet yesterday and I am not getting it;

8/20/2017—eggs this morning were rotten, brown with a foul odor;

8/21/2017—served a sandwich with a dead fly smashed into the breach; check sandwiches every time to see what color the bologna is and make sure it is edible; believe fly was intentionally put on my sandwich because of someone's annoyance with having to prepare me a special extended diet;

8/23/2018—inmates know who gets the special trays in the pod; since August 18th our trays have been noticeably smaller as well as being served the smallest blueberry muffins and brownies from the corner section of the pan, where they are almost always overcooked if not burnt; I was placed on an augmented diet for being twenty-five pounds underweight after being in the CCDC for only five months;

9/1/2017—served another rotten egg; it was brown and had a bad smell; I returned it and got nothing in its place; meager diet is bad enough without being served rotten food; am on a special diet and should be getting more calories than that provided to other inmates.

9/12/2017—my trays are consistently less proportional than other inmates; I believe this is intentional because I get a special diet; I always get half as much as other inmates.

(Doc. 24-3 at 1-26).

Plaintiff testified at his deposition that the inmates received no vitamin C, did not get any fruit, and did not get a whole lot of vegetables. (Doc. 24-10 at 27 & 69). They would get beans for protein. *Id.* at 69. When they did get vegetables, it would be a tossed salad, "which [was] more roughage than anything," or steamed cabbage, which they got "quite a bit." *Id.* Plaintiff did not believe the inmates were receiving a "healthy, balanced

10

diet." *Id.* at 69-70. He did not believe the diet was varied enough. *Id.* at 70. Plaintiff testified the meals were the same every day, and they did not get vegetables containing beta carotene or other vitamins and minerals that "anyone would consider part of a healthy diet." *Id.*

Plaintiff indicated he had no way of knowing how many calories inmates were getting or how many he needed in a day. (Doc. 24-10 at 28-29). Plaintiff testified he weighed 170 pounds[2] when he was booked in and got down to only 155 pounds in May or June. (Doc. 24-10 at 32, 36). He got back up to about 170 pounds after he began receiving double portions in the evenings. *Id.*

According to Plaintiff, on August 18, 2017, the doctor ordered him to receive both double portions *and* a high protein diet. *Id.* at 55. However, Plaintiff stated the notation in his file only ordered double portions. Plaintiff testified that it was not until October 23, 2017, that he began receiving double portions in the evening. *Id.* at 32. Plaintiff also testified that after he was incarcerated, he began noticing blood in his stool, bleeding from his gums, and increasing trouble with urination. *Id.* at 71. Plaintiff believed it was a possibility that these physical problems were related to the lack of fruit and the lack of a variety of vegetables. *Id.*

Sergeant Lemus responded to most of the grievances, but Lieutenant Williams responded to a couple of them. *Id.* at 78. According to the grievance responses, Sergeant Lemus checked with various staff members mentioned by Plaintiff to get the problems regarding his meals and portion sizes resolved. (Doc. 24-3). Sergeant Easter

---

[2] The booking records confirm that his weight was 170. (Doc. 24-2 at 2).

responded to the two grievances about rotten eggs, stating she would speak to the officers and kitchen staff about the issues. *Id.* at 19, 22.

### C. Price Gouging—Hygiene Items and Over-the-Counter Medications

Plaintiff's next claim is that he was charged too much for basic hygiene products and over-the-counter medications. Plaintiff testified that inmates even pay for toilet paper and soap. (Doc. 24-10 at 82). He believed he was charged about 50 cents for one roll of toilet paper, but in the free world, he could buy four rolls of toilet paper for about 99 cents, and even less if the product was on sale. Plaintiff did not believe inmates should be charged for toilet paper or other basic hygiene items. He agrees, however, that he was never denied toilet paper when he needed it unless the jail was out of it.

With respect to over-the-counter medications, Plaintiff believes it is a violation of federal law to sell products marked "not for individual sale." *Id.* at 84. He believes Defendants bought medications, such as Ibuprofen, in bulk and then charged inmates twenty cents per pill. He claims that this was a "crazy amount of money." *Id.* Plaintiff also testified that he knew that in the Arkansas Department of Corrections, inmates were not charged for basic hygiene items or over-the-counter medications. *Id.* at 82, 85.

Plaintiff was asked in his deposition whether any of the named Defendants was involved in the pricing of commissary items. *Id.* at 86. He responded that he believed Lieutenant Williams "most certainly" was involved in decisions about what to charge for the items. *Id.* Plaintiff claims he spoke directly with Lieutenant Williams about the cost of the items at some point. *Id.* at 86-87.

## D. Television and Reading Material

On August 7, 2017, Plaintiff submitted a grievance about the television being left on the CNN channel for three weeks straight. (Doc. 24-3). Sergeant Lemus responded that he was sure he had changed the television to FOX News last week. Plaintiff replied that Sergeant Lemus was wrong. Sergeant Lemus then responded that he would have the officers change the channel.

Plaintiff testified that the television is on in the jail 24 hours a day,[3] and the volume was set at a level where it could be heard even within the cells. (Doc. 24-10 at 88, 90). He claimed there was nothing one could do to muffle the sound, "so everything is a really big echo." *Id.* at 88. He also indicated that he was tired of hearing propaganda on the news and of not having the office of the President accorded dignity and respect. Plaintiff later clarified in his deposition that the jail played news channels during the week, but on the weekends, the jail staff turned the channel to "TV Land" to broadcast non-news shows.

Plaintiff believes he has a First Amendment right to decide what he wants to see or hear, and that inmates should be allowed to change the television channels themselves. In his pod at the time of his deposition, there were 12 inmates, and Plaintiff explained that he believed his podmates should be able to decide by majority consensus which channels to watch.

Plaintiff also complained that the CCDC's rule that inmates may only have three books in their cells at a time is unconstitutional. *Id.* at 93. He believes that under the

---

[3] This testimony contradicts several other grievances Plaintiff submitted. *See* Doc. 24-3 at 2, 9, 11. Plaintiff stated in those other grievances that the television was not on early in the day. *Id.*

Constitution, he should be entitled to have as many books in his cell as he wishes. He also noted that the jail policy prevents people from mailing inmates any books. He argues that the book restriction is potentially ambiguous in its application, as jail staff are permitted to determine what does, and does not, qualify as a "book." *Id.* at 94. However, he concedes that the jail permits him to keep "envelopes full of" religious materials in his cell at all times, *id.*, and allows him to keep the religious pamphlets he receives in the mail and the reading materials his pastor leaves for him when he visits. In addition to all that, the jail also permits Plaintiff to keep "two translations of the Scriptures" in his cell and has not required that he limit the number of religious texts in his cell due to the three-book limitation or any other jail rule. *Id.* at 93.

## E. Religious Visits and Materials

Plaintiff claims he was raised as a Roman Catholic but came to the realization that "modern day Christianity is not in tune with how the early church was founded." (Doc. 24-10 at 75). He indicates that he believes what "your standard Christian would believe," but he looks to the "Book of Acts, Chapter 24, where Paul talks about [being] a follower of the Way." *Id.* Plaintiff testified he gets a "lot of literature from a place called Yahweh's Assemblies in Yahshua." *Id.* at 76. The pastor who visits him every Thursday at the CCDC is from "a group called Ozark Hebrew Heritage," which is a "Messianic Hebrew organization." *Id.* While Plaintiff believes in the New Testament, the members of his church, Ozark Hebrew Heritage, "follow more of the way [of] the early Jewish Christians." *Id.*

On July 1, 2017, Plaintiff submitted a grievance stating he had been denied his pastoral visit on June 29th. (Doc. 24-3 at 8). He indicated he was in the visitation section

14

the whole time, and the guards were notified about his pastor's presence three times. Sergeant Morrell responded that he would look into it. However, Sergeant Morrell noted that there were times where the officers got busy, and June 29th may have been one of those times.

On July 13, 2017, Plaintiff claimed that again he missed his pastoral visit. *See id.* at 13. Plaintiff stated that he was denied written material the pastor left for him. Plaintiff indicated that the material was "directly related to prophecy from the Bible that we have been studying." *Id.* Sergeant Lemus responded that he was not aware of this incident and would figure out what was going on.

On July 21, 2017, Plaintiff complained that he had not yet received the material left for him by his pastor. *Id.* at 23. Plaintiff asserted that the jail officers were not qualified to determine what type of material was relevant to his religious beliefs. Sergeant Lemus responded that the only reason he could see that the material was not immediately given to Plaintiff was that it contained staples. It appears the staples were eventually removed and the material was given to Plaintiff.

On August 31, 2017, Plaintiff submitted a grievance stating that the guard did not come to take him to visitation with his pastor in a timely manner. On September 9, 2017, Plaintiff claimed in a grievance that his pastor had left religious material for him on September 7, 2017, and he had not received it. *Id.* at 24. Sergeant Lemus responded that he would look into it. On September 10, 2017, Plaintiff claimed he had not yet received the religious material mentioned in the September 7 grievance. *Id.* at 25. Sergeant Morrell replied that the only material he was aware of was a full-size calendar that was not an "allowed" item.

On September 12, 2017, Plaintiff submitted a grievance about his failure to receive a calendar that denotes when sabbath feasts occur. *Id.* at 27. Plaintiff stated that the calendar provided the only way of knowing when these special sabbath fasts took place, and without it, Plaintiff would not be able to practice his religion effectively. Lieutenant Williams responded that, after consulting with the County attorney, the CCDC would be making Plaintiff photocopies of the calendar so as not to deprive him of the religious information. On September 13, Plaintiff complained the copies provided by the jail were poor and illegible. Plaintiff indicated he could not read the time that each sabbath feast began, and that some of the recommended scripture readings were illegible. In response, Lieutenant Williams suggested that if the photocopies were insufficient, Plaintiff should request that the source material be provided in a different way so the jail staff would be permitted to give it to him.

On September 14, 2017, Plaintiff submitted a grievance stating he had been denied a visit with his pastor. (Doc. 24-3 at 28). He stated his pastor was there every Thursday at 2:00 p.m. and visited with Plaintiff and Jeremiah Bliss. Plaintiff also stated that there were times his pastor was kept waiting for up to an hour, which resulted in Plaintiff's visit being cut short. Plaintiff mentioned there were times staff were slow in switching out the Plaintiff and Bliss. Plaintiff apparently suggested the possibility of a group meeting in M pod with the pastor and Bliss, and Sergeant Lemus indicated he would look into that possibility and speak with Sergeant Morrell about why the staff were unable to switch inmates in a timely manner.

Plaintiff further claims that when he was in solitary confinement, he was not allowed to attend church services. *Id.* at 99. There do not appear to be any other facts alleged to

support this claim. As for who might be liable for the alleged violations of his right to free exercise of religion, Plaintiff could not say if any of the named Defendants denied him the opportunity to see his pastor. Instead, he testified that he sued the named Defendants because "they're the ones that are in an administrative capacity," and he believed they "were the ones handing down the orders." (Doc. 24-10 at 39). In Plaintiff's view, the Defendants were the "ones who allow certain behaviors to carry on even after I've spoke up, you know." *Id.*

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Commerce v. Dow Chemical Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the

17

record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II. DISCUSSION

Defendants maintain they are entitled to summary judgment because: (1) they were not deliberately indifferent to Plaintiff's medical needs with respect to his diet or his need for blood testing; (2) there is no constitutional right to particular pricing on commissary items; (3) Plaintiff's First Amendment rights were not violated with respect to Plaintiff's access to information or his free exercise of religion; (4) Defendants are entitled to qualified immunity; and (5) there is no basis for official capacity liability.

### A. Conditions of Confinement Claims

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment.[4]   U.S. Const. amend. VIII.   The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 851

---

[4] Plaintiff is a pretrial detainee. However, the Eighth Circuit has consistently applied the Eighth Amendment to conditions of confinement claims brought by pretrial detainees. *See, e.g., Davis v. Oregon Cnty., Mo.*, 607 F.3d 543, 548 (8th Cir. 2010) ("Pretrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment") (internal quotation marks and citation omitted).

(1998) (citation omitted). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

"The Eighth Amendment prohibits punishments that deprive inmates of the minimal civilized measure of life's necessities." *Smith v. Copeland*, 87 F.3d 265, 268 (8th Cir. 1996). Jail or prison officials must provide reasonably adequate ventilation, sanitation, bedding, hygienic materials, food, and utilities. *Id.* Prison conditions claims include threats to an inmate's health and safety. *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008) (citation omitted).

To state an Eighth Amendment claim, the plaintiff must allege that prison officials acted with "deliberate indifference" towards conditions at the detention facility that created a substantial risk of serious harm. *Farmer*, 511 U.S. at 834. "Conditions of confinement, however, constitute cruel and unusual punishment 'only when they have a mutually enforcing effect that produces deprivation of a single, identifiable human need such as food, warmth, or exercise.'" *Whitnack v. Douglas Cnty.*, 16 F.3d 954, 957 (8th Cir. 1994) (quoting *Wilson v. Sieter*, 501 U.S. 294 (1991)).

The deliberate indifference standard involves both an objective and a subjective component. The objective component requires an inmate to show that "he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834 (citations omitted); *see also Hudson v. McMillian*, 503 U.S. 1, 2 (1992) (objective component is "cortextual and responsive to corternporary standards of decency") (quotation omitted). To satisfy the subjective component, an inmate must show that prison officials had "a sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (citations omitted); *see also Brown v. Nix*, 33 F.3d 951, 954-55 (8th Cir. 1994). The

subjective component "requires proof of a reckless disregard of a known risk." *Crow v. Montgomery*, 403 F.3d 598, 602 (8th Cir. 2005) (citation omitted).

## 1. Denial of Medical Care

The Eighth Amendment prohibition on cruel and unusual punishment prohibits deliberate indifference to the serious medical needs of prisoners. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). "'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but *deliberately* disregarded those needs.'" *Jolly v. Knudsen,* 205 F.3d 1094, 1096 (8th Cir. 2000) (quoting *Dulany v. Carnahan,* 132 F.3d 1234, 1239 (8th Cir. 1997)).

To show he suffered from an objectively serious medical need, Plaintiff must show he "has been diagnosed by a physician as requiring treatment" or has an injury "that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011) (internal quotations and citations omitted). Defendants admit that hypoglycemia is a serious medical condition, but they argue there is no evidence Plaintiff actually has that condition. Medical staff, however, assumed Plaintiff's health complaints were true and provided him with a bedtime snack, and later ordered that he receive double portions of food and a high protein diet. Defendants treated Plaintiff as though he had an objectively serious medical need, and the Court will assume that medical need, as well, for purposes of discussion.

To establish the subjective prong of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation. Deliberate indifference is akin to criminal recklessness, which demands more than negligent

20

misconduct." *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008) (internal quotation marks and citations omitted).

Here, Defendants argue they cannot be held liable for any of Plaintiff's medical complaints because they are non-medical personnel who were not personally involved in Plaintiff's medical care. While it is true that § 1983 liability requires some personal involvement or direct responsibility, this does not mean that non-medical personnel are necessarily insulated from liability. In this case, however, Plaintiff testified that he did not know if the named Defendants were aware of his complaints about delays in receiving medical care or about the doctor's orders not being carried out. Plaintiff does not argue that any of the Defendants were personally involved in the provision of medical care to him.

The only Defendant directly involved in responding to one of Plaintiff's medical grievances was Lieutenant Williams, who took action in response to Plaintiff's grievance about seeing the doctor when the waiting list was full for the month. Plaintiff does not dispute that Lieutenant Williams contacted medical personnel and assured Plaintiff that he would be seen by the doctor that month. Therefore, Lieutenant Williams' actions do not suggest deliberate indifference on his part—quite the opposite in fact. Assuming the facts in the light most favorable to Plaintiff, the Court concludes that no individual liability claims are stated with respect to the denial of medical care claims, and they are accordingly subject to dismissal with prejudice.

As for Plaintiff's official capacity claim, he argues that Defendants failed in their administrative capacity to assure that the doctor's orders were faithfully executed. A claim against the Defendants in their official capacities is the equivalent of a claim against the

21

governmental entity that employs the officials, here Carroll County. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). To establish Carroll County's liability, Plaintiff must show an unconstitutional policy or custom that was the moving force behind the violation of his Eighth Amendment right to adequate medical care. *Jenkins v. Cnty. of Hennepin*, 557 F.3d 628, 633 (8th Cir. 2009). The summary judgment record lacks any suggestion of the existence of such a custom or policy. Moreover, Plaintiff's official capacity claim fails because he suffered no constitutional deprivation. *Cooper v. Martin*, 634 F.3d 477, 481-82 (8th Cir. 2011) ("In order for municipal liability to attach, individual liability must first be found on an underlying substantive claim.") (internal quotation marks and citation omitted). For these reasons, the official capacity claims are likewise dismissed with prejudice.

## 2. Diet

The Eighth Amendment's prohibition against cruel and unusual punishment is violated if an inmate is not provided with meals adequate to maintain his health. *See, e.g., Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992) (prisoners have a right to nutritionally adequate food); *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980) (prisoners are guaranteed a reasonably adequate diet). "The Eighth Amendment requires only that prisoners receive food that is adequate to maintain health; it need not be tasty or aesthetically pleasing." *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993).

As discussed above, an Eighth Amendment claim has both an objective and subjective component. *Farmer*, 511 U.S. at 834. In claims involving allegations of an inadequate diet, the subjective component requires the Plaintiff to show that the

Defendants were deliberately indifferent to his dietary needs. *Wishon*, 978 F.2d at 449.

"Because control of the administrative details of a prison remains exclusively in the hands of prison officials, control of the diet is within their discretion, assuming it is adequate." *Burgin v. Nix*, 899 F.2d 733, 734 (8th Cir. 1990).

Plaintiff first complains about the "meager" meals inmates were provided. He maintains he lost a significant amount of weight as a result. The record, viewed in the light most favorable to Plaintiff, shows that Plaintiff's weight was 170 pounds at booking, dropped to 155 pounds in May or June, went up to 165 pounds after he was ordered to receive double portions in August, and eventually went back up to 170 pounds. A loss of 15 pounds over the course of two to three months is not insignificant. Clearly, the Constitution would not permit the "incremental starvation" of inmates, *George v. King*, 837 F.2d 705, 707 (5th Cir. 1988); however, the loss of weight must be considered in context.

According to the National Institutes of Health ("NIH") Body Mass Index ("BMI") calculator, a man of Plaintiff's size and weight on the day of booking (5'11," 170 pounds), would have had a BMI of 23.7, which is within the normal range of 18.5-24.9. Even at a weight of 155 pounds, Plaintiff's BMI of 21.6 fell well within the normal range.[5] The NIH indicates that "a reasonable and safe weight loss is 1-2 pounds per week."[6] Viewing the evidence in the light most favorable to Plaintiff, he lost weight at a rate of approximately two pounds per week, which is considered by the NIH to be reasonable and safe.

---

[5] https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (accessed August 30, 2018).

[6] https://www.nhlbi.nih.gov/health/educational/lose_wt/control.htm (accessed August 30, 2018).

The fact that Plaintiff lost 15 pounds over the course of several months suggests nothing more than that he no longer had control over the portion size and content of his meals, perhaps did not get served foods he enjoyed, and did not have access to food in between meals unless he had funds to purchase commissary items. "Unlike life outside of the jail, inmates are not allowed to 'raid the refrigerator' thereby having unlimited access to food. This is simply one of life's pleasures that confinement must restrict for safety and security reasons." *Lane v. Hutcheson*, 794 F. Supp. 877, 882-83 (E.D. Mo. 1992); s*ee also Lunsford v. Bennett*, 17 F.3d 1574, 1578 (7th Cir. 1994) (inmates not entitled to food that is "tasty, hot, or even appetizing").

Next, Plaintiff contends that his diet contained no vitamin C, no fresh fruits, and few fresh vegetables, except for the occasional tossed salad, and that portion control was almost nonexistent. Plaintiff testified, however, that he frequently received cooked cabbage with his meals. With respect to the lack of fresh fruits and vegetables, the Constitution provides only that inmates be provided with reasonably adequate food. *Campbell*, 623 F.2d at 508. Further, there is nothing in the record that suggests Plaintiff's health suffered from any vitamin deficiency while he was incarcerated at the CCDC.

The fact that Plaintiff did not for a period of time receive the double portions ordered by the doctor does not demonstrate Defendants' deliberate indifference to Plaintiff's health or safety. Further, Plaintiff has presented no facts to suggest that this alleged failure was attributable to any of the named Defendants. *See, e.g., Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985) (for liability to attach, defendants must be involved in or directly responsible for incidents that injured the plaintiff).

Plaintiff also maintains that the food service at the CCDC was unsanitary because the inmates served the meal trays without wearing gloves and were not trained professionals. Inmates, however, served the food only part of the time. Further, food service workers not wearing gloves is a "problem" faced by the vast majority of the population, whether or not incarcerated. While the use of gloves may be desirable, "absent some indication that the food or drink itself is unsanitary or that the server has a medical condition which poses a risk of harm to inmates who consume the food and drinks," no constitutional claim is stated. *Hall v. Jarrigan*, No. 2:07-cv-127, 2008 WL 5377893, at *5 (E.D. Tenn. Dec. 18, 2008) (citations omitted).

It is clear that Plaintiff did not like the meals served at the CCDC; however, his allegations set forth in detail above are insufficient to establish a constitutional violation. A constitutionally inadequate diet must constitute an "unquestioned and serious deprivation of basic human needs." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Here, none of the diet and food safety issues raised by Plaintiff suggest that he was deprived of the minimal civilized measure of life's necessities or that Defendants were deliberately indifferent to an excessive risk of harm to Plaintiff's health or safety. *Farmer*, 511 U.S. at 834. In short, the inadequacies identified by the Plaintiff are insufficient to create a genuine issue of material fact as to whether the diet he received was so inadequate that it violated the Eighth Amendment.

Additionally, Plaintiff has not identified any evidence to suggest that the named Defendants were personally involved in, or directly responsible for, determining what diet should be served to the inmates. Plaintiff alleges that Sergeant Easter was in charge of the kitchen, but mere supervisory authority is insufficient to establish liability. *See, e.g.,*

*Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) ("To establish personal liability of the supervisory defendant, [Plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights.").

Finally, with respect to Plaintiff's official capacity claim concerning his diet, he must show the Defendants acted pursuant to an official custom or policy. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-94 (1978). The policy or custom must also be the moving force behind the alleged constitutional violation. *Id.* at 694 ("Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983."). Plaintiff has made no such showing. For all of these reasons, Defendants are entitled to summary judgment on all of Plaintiff's dietary claims.

### 3. Prices Charged for Hygiene Items and Over-the-Counter Medication

Plaintiff maintains that inmates should not be required to pay for basic hygiene items. Further, he maintains the prices charged for the hygiene items and for over-the-counter medication are excessive. Although the record reflects there were certain occasions when the facility was out of some hygiene items and Plaintiff and others had to wait until new supplies came in, Plaintiff concedes he was never denied any hygiene items when he needed them. Plaintiff does not suggest he was denied any medication.

Plaintiff's claims as to hygiene and over-the-counter medications fails for several reasons. First, even if exorbitant amounts are charged by the jail, no constitutional claim is stated. *See, e.g., Emery v. Helder,* 2018 WL 715463, at *9 (W.D. Ark. Feb. 2, 2018) (no constitutional right to access to a commissary or to purchase items at free world prices); *Lewis v. Holloway*, 2017 WL 3461303, at *4 (W.D. Ark. Aug. 11, 2017) (no constitutional claim stated even if exorbitant amounts are charged); *Pagan v. Westchester*

26

*Cnty.*, 2014 WL 982876, at \*17 (S.D.N.Y. March 12, 2014) (even if the facility charges high prices for items, no constitutional claim will be stated). Second, Plaintiff does not claim he was denied any basic hygiene items or medication. Third, Plaintiff does not identify any named Defendants as being involved in or responsible for these claims. Finally, Plaintiff fails to allege the existence of any custom or policy that was the moving force behind these alleged constitutional violations. For all of these reasons, Defendants are entitled to summary judgment on these claims, and they will be dismissed with prejudice.

## B. First Amendment Claims

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989). "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1972). Among other things, the "Constitution protects the rights to receive information and ideas." *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972).

## 1. Television Tuned to News Channels

Plaintiff objects to the day-room television remaining set to one or two news channels during the week. Plaintiff believes the jail should provide more of a variety of programming rather than just the news. He also maintains that inmates should have a say as to what channels are played on the television. These claims fail. While inmates have a right to some source of news media, there is no constitutionally protected right to watch television. *See, e.g., Murphy v. Walker*, 51 F.3d 714, 718 n. 8 (7th Cir. 1995); *Manley v. Fordice*, 945 F. Supp. 132, 137 (S.D. Miss. 1996). It necessarily follows that

27

inmates have no right to select the channel on the television. The Defendants are entitled to summary judgment on the claims related to television programming.

## 2. Limitations on Reading Materials

Plaintiff first maintains that the jail's policy limiting each inmate to three books in a cell at a time is unconstitutional. He asserts that under the Constitution, he should be entitled to have as many books as he wants in his cell. He does not claim that the book limitation is restricting his ability to freely exercise his religion, as he admits that he is permitted to keep all his religious texts in his cell. He simply argues that his decision to keep religious materials in his cell could potentially mean that he might be deprived of possessing other non-religious books in his cell, such as a Webster's dictionary. He also contends that the jail does not permit inmates to receive books sent in the mail. Apparently, "Bible studies and pamphlets and things like that" are permitted to be received by mail, but Plaintiff has been told he's "not allowed to have people mail books." (Doc. 24-10, p. 95).

Inmates' First Amendment rights may be restricted or limited by prison regulations that are reasonably related to legitimate penological needs. "[I]ncarceration necessarily, and constitutionally, entails restrictions, discomforts, and a loss of privileges that complete freedom affords." *Rhodes v. Chapman*, 452 U.S. 337, 369 (1981). There is no constitutional right to possess a certain number of non-religious books in one's cell. Plaintiff concedes "that there's a limitation on space here in the jail," but he nonetheless believes inmates "should be able to occupy our personal space with what we decide to occupy it with, provided it's not dangerous material or anything." (Doc. 24-10, p. 94). Defendants respond that the jail's three-book restriction is valid based on the "logistics

of the operation of the jail and the limited space available," which "necessitate some restriction on the amount of property that an inmate may keep in his/or her living area." (Doc. 23 at 9). There are no facts in the summary judgment record to suggest that Plaintiff has suffered a violation of his rights of constitutional dimension due to the three-book policy. Defendants have explained the reason behind the rule, and the rule is justified due to prison logistics and space considerations; further, implementation of the rule has not had the effect of depriving Plaintiff of any of his religious materials.

When determining whether a restriction is valid, the court must consider: (1) whether a valid, rational connection exists between the regulation and a neutral, legitimate government interest; (2) whether alternative means exist for inmates to exercise the constitutional right at issue; (3) what impact the accommodation of the right will have on inmates, prison personnel, and allocation of prison resources; and (4) whether obvious, easy alternatives exist. *Turner v. Safely*, 482 U.S. 78, 89 (1987). If the Court were to assume that the three-book limit impacted Plaintiff's constitutional rights in some respect, the Court would nonetheless find that Defendants articulated a legitimate government interest supporting that limitation. Further, Plaintiff has failed to carry his burden on summary judgment of showing that there are genuine, material facts in dispute regarding any deprivation of his First Amendment right resulting from the jail's three-book policy or any other policy regarding reading materials. This claim will therefore be dismissed on summary judgment.

### 3. Limitations on Pastoral Visits and Church Services

Inmates retain many protections afforded by the First Amendment, including its directive that "no law shall prohibit the free exercise of religion." *O'Lone v. Estate of*

*Shabazz,* 482 U.S. 342, 348 (1987); *see also Cruz v. Beto,* 405 U.S. 319 (1972). This right, however, is not without limitation. The Supreme Court has recognized that "incarceration brings about the necessary withdrawal or limitation of many privileges and rights." *O'Lone,* 482 U.S. at 348. "The free exercise right is limited insofar as a prisoner's adherence to religious practices may be regulated by prison authorities, so long as such regulations are 'reasonably related to legitimate penological interests.'" *Murphy v. Carroll,* 202 F. Supp. 2d 421, 424 (D. Md. 2002) (quoting *Turner,* 482 U.S. at 89; *O'Lone,* 482 U.S. at 348–349; *Cruz,* 405 U.S. at 322); *see also Thomas v. Gunter,* 32 F.3d 1258, 1259–60 (8th Cir. 1994).

In analyzing a First Amendment free-exercise claim, the Court first addresses the "threshold issue of whether the challenged governmental action 'infringes upon a sincerely held religious belief,' and then app[ies] the *Turner* factors to determine if the regulation restricting the religious practice is 'reasonably related to legitimate penological objectives.'" *Murphy v. Mo. Dep't of Corr.,* 372 F.3d 979, 983 (8th Cir. 2004). According to Plaintiff's testimony, his pastor visited him at the jail once a week on Thursdays at 2:00 p.m. The pastor often visited both Plaintiff and another inmate named Jeremiah Bliss. On June 29, July 13, August 31, and September 14, Plaintiff submitted grievances about missing his pastoral visits. Plaintiff testified, however, that there were as many as ten or more occasions when jail staff either negligently or intentionally denied his visits with his pastor. In addition, Plaintiff claims his constitutional rights were violated when he was denied the opportunity to attend church services while in solitary confinement.

With respect to inmates' access to clergy, the CCDC policies provide as follows:

Detainee visitation with a pastor may be requested by the detainee or at the request of a pastor for a specific detainee. All personal visits between

30

detainees and pastors are held in the visitation room. Length of visit should equal normal visiting timeframe of 50 minutes unless more time is specifically requested by the detainee and approved by the Jail Administrator.

Worship services have been approved for Tuesday through Sunday each week at 3:00 p.m. These services are held for male detainees in the hallway outside E Pod. Available space and security concerns require that detainee attendance is rotated equally among the mail pods . . . . One hour is allotted for . . . services.

\* \* \*

Although access to clergy . . . will be made available whenever possible, emergency situations and times when large numbers of detainees are being moved within or from this facility may alter the scheduled time for these visits. The Shift Supervisor may delay or cancel these visits or worship services under these circumstances.

(Doc. 24-9 at 8-9).

Defendants attach to their Motion a log that purports to show the dates and times that Plaintiff was taken to and from his visits with his pastor. (Doc. 24-8 at 3-4). Plaintiff points out that the log itself contains inconsistencies as to certain dates, including June 15, June 22, July 8, August 17, September 18, and September 21. *Id.* On these dates, the log contains two separate entries for the time Plaintiff was taken "from" visitation, with the entries varying in time by as much as two hours. *Id.* These inconsistencies concerning the timing of the visits are not material, though; the issue is whether visits occurred at all. There are two dates, June 29 and July 13, that are listed on the log and correspond to the dates Plaintiff submitted grievances stating he never saw his pastor, even though Plaintiff was waiting to see him in the visitation room. *Id.* No explanation is offered by Defendants as to why the log would show a visit with the pastor when none occurred. No other information has been submitted on summary judgment that would provide further information about the times that inmates are generally moved to the

visitation room and removed from the visitation room, and what generally occurs when two inmates are seeing the same pastor on the same date.

Two pages of the log contain the dates and times that Plaintiff attended church services. (Doc. 24-8 at 1-2). Plaintiff does not claim he was denied permission to attend church services in general. Rather, he only contends he was denied the ability to attend church services while in solitary confinement. Defendants' log indicates that Plaintiff attended church services on 16 occasions between May 20 and October 14. Plaintiff was also permitted to keep his religious texts with him while he was in solitary confinement.

With respect to these free-exercise claims, Plaintiff "bears the burden of establishing that the correction facility placed a substantial burden on his sincerely-held religious belief." *Gladson*, 551 F.3d at 833. However, if Plaintiff "fails to put forth sufficient evidence that his ability to practice his religion has been substantially burdened, then the court need not apply the *Turner* test." *Id.* Here, after examining the record and assuming the facts in the light most favorable to the Plaintiff, the Court concludes that he has not shown that the actions or restrictions he complains of "inhibit[ed] or restrain[ed] [his] conduct or expression; meaningfully curtail[ed] [his] ability to express adherence to [his] faith; or denie[d] [him] reasonable opportunities to engage in those activities that are fundamental to [his] religion. As a result, [Plaintiff] . . . [has] not offered sufficient evidence to create a genuine issue of material fact sufficient for a jury to find that [his] ability to practice [his religion] has been substantially burdened." *Id.* at 834. The Court therefore need not address whether the actions or restrictions alleged were

reasonably related to any legitimate penological objective, and Defendants will be granted summary judgment on this claim.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment (Doc. 22) is **GRANTED**, and the case is **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED** on this 3rd day of October, 2018.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE